# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**UNITED STATES OF AMERICA,**

    **Plaintiff,**

*vs.*                                  **CRIMINAL ACTION NO. 1:06CR11**

**THOMAS SCRITCHFIELD,**

    **Defendant.**

## REPORT AND RECOMMENDATION/OPINION

On the 8th day of March, 2006, Defendant, by counsel, filed his "Motion to Suppress" [Docket Entry 35].[1] The United States filed its Response to Defendant's motion on March 17, 2006 [Docket Entry 38]. The motion was referred to the undersigned United States Magistrate Judge by Chief United States District Judge Irene M. Keeley on March 20, 2006 [Docket entry 41].

On March 20, 2006, Defendant appeared in person and by his counsel D. Luke Furbee and Gary Rymer, and the United States appeared by its Assistant United States Attorney Sherry Muncy for hearing on Defendant's motion. The Court heard the testimony of FBI Special Agent Brian Fox and the arguments of counsel.

### I. Procedural History

Defendant was indicted by a grand jury sitting in the Northern District of West Virginia at Clarksburg, on February 7, 2006. He is the sole defendant in a six-count indictment which includes one count of conspiracy to distribute cocaine; four counts of distribution of cocaine; and one count of threatening an individual in retaliation for information he provided to a law enforcement officer.

---

[1]Plaintiff also filed a "Motion for Production/Disclosure of Title III Wiretap Application and Order of Authorization" [Docket Entry 36], "Motion for Additional Discovery" [Docket Entry 37], and "Motion to Sever" [Docket Entry 34], which motions are addressed in separate Opinions.

## II. Hearing Testimony

The Court heard the testimony of FBI Special Agent Brian Fox. He testified he and other law enforcement officers were investigating several individuals for distribution of illegal drugs in the Clarksburg, West Virginia area. Those individuals included Ross Sine and Blair Jones, who have already appeared before the Court as defendants in drug cases. Defendant's case was an "offshoot" of the original investigation – in the course of that investigation, it was discovered that he might be involved. Defendant himself then became a "target" of an investigation. Agent Fox testified that law enforcement officers arranged or made controlled buys from Defendant prior to January 6, 2006. These controlled buys were recorded. The confidential informants used by law enforcement included Ross Sine, Brian Sine, and others. Agent Fox also testified that law enforcement most likely had enough evidence for probable cause to arrest and indict Defendant for distribution of illegal drugs before January 6, 2006.

Agent Fox testified that on the afternoon of January 6, 2006, he and Officer Antulock of the West Virginia State Police went to Defendant's residence. He testified the purpose of going to Defendant's residence was twofold:

1) He was required to provide Defendant with written notice that he had been intercepted in a court-authorized wiretap, which he did; and

2) To inform Defendant of the progress of the drug investigation and to attempt to solicit his cooperation in the investigation of other parties.

The officers went to the door and knocked. Defendant answered the door himself. The officers, both in plain clothes, identified themselves. Agent Fox recognized Defendant from controlled buys he arranged through Ross Sine. Defendant let the officers into his residence. The

officers told Defendant why they were there. They told him about the investigation and that "he was pretty much done." Agent Fox testified it was a common practice to interview targets to find out if they would cooperate with an investigation.

Agent Fox testified that Defendant never asked the officers to leave. There were certain questions Defendant said he did not want to answer, but the officers told him they would not talk about those further, and "did not press" him on those questions. Besides those certain questions, Defendant never said he did not want to answer questions. Defendant was not handcuffed at any time, was not restrained, was not told he could not leave, was not told he could not have counsel, was not threatened, and was not taken into custody. He was specifically told he was not going to be taken into custody that day. The officers did not have a warrant to arrest him.

On cross examination, Agent Fox testified he did not inform Defendant he had a right to an attorney; he did not tell Defendant, after the interview started, that he did not have to talk to them; he did not expressly tell Defendant he "could kick them out;" he did not tell Defendant, after the interview had started, that he was free to terminate it; he did not advise Defendant to consult with an attorney; he did not advise him that an attorney would be provided if he could not afford one; and he did not inform Defendant his statements might be used against him in his own prosecution. Agent Fox testified he did tell Defendant at the beginning of the interview that he did not have to talk to them, and also told him, when he was reluctant to answer a certain line of questions, "ok, you don't have to answer."

Agent Fox testified that at some point during the interview other subjects arrived at the residence, and the officers did not want to continue Defendant's interview in those subjects' presence. They therefore went outside. Defendant sat in Officer Antulock's vehicle. Agent Fox

3

testified he may have said to Defendant, "Why don't you sit in the car because it's cold outside?" He testified he had Defendant sit in the car because it was cold. The vehicle was located on the street in front of Defendant's house.

Agent Fox also testified he told Defendant it would be in his "best interests" to cooperate, and that if he cooperated he could possibly get a better deal, with the prosecutor's assistance. He testified that Defendant was "fundamentally cooperative" – he was "not thrilled" they questioned him or were investigating him, but he never asked them to leave.

Agent Fox testified that the interview was mostly to ensure that Defendant was cooperative. The officers could verify whether Defendant was being truthful by asking him questions to which they already knew the answers. He testified he did not specifically intend to use anything Defendant said against him at the time of the interview. His only intent at the time was to get Defendant's cooperation and verify his credibility. The officers did ask Defendant if he recognized certain individuals in a drug book, and did ask about the same individual more than once on several occasions. The interview, however, was not lengthy or in-depth. It lasted about 45 minutes. It was intended only to try to get Defendant's cooperation and convince him law enforcement knew about the people with whom he was dealing. When they determined they would make no further progress getting Defendant's cooperation at that time, they ended the interview and told him to take the weekend to think about it. They did not learn anything new except for a few incidental details, such as customers whose names they had already heard. They had already known almost everything he told them.

At the end of the interview, the officers asked Defendant if he wanted to cooperate. Defendant was reluctant, and said he would have to think about it. The officers told him to think

about it over the weekend and they would contact him the following week.

On January 12, 2006, Defendant called Agent Fox on his cell phone, and they talked a couple of times, but the cell phone kept "dropping out." Agent Fox finally called Defendant back. Defendant never indicated he wanted an attorney. Defendant was not under any restraint at the time. In fact, Agent Fox did not even know where Defendant was during this call, since he used a cell phone. Defendant was Mirandized prior to a January 13, 2006, statement.

## II. Motion to Suppress

Defendant moves the Court to suppress and prohibit the Government from attempting to introduce into evidence all or a portion of 15 separate items or categories of items. As grounds for the motion, Defendant alleges:

> All of the foregoing items and/or statements were obtained in violation of the Fourth, Fifth and Sixth Amendments to the United States constitution and other applicable statutory and decisional law of the United States. The burden is upon the government to prove that said items were lawfully obtained under the facts and circumstances of this case.

(Defendant's Motion at 2). Defendant argues:

> Pursuant to the Fed. R. Cr. P. 12(b)(3)(C), Defendant is entitled to require the Government to prove prior to trial that all statements of the Defendant and all evidence allegedly seized from the Defendant were procured constitutionally and are otherwise admissible at a trial on the merits.

(Defendant's Motion at 3).

In its Response, the Government argues:

> Apparently the defendant in this motion attempts to suppress any and all evidence that the government may use to support its case. Response to the allegations would be a trial before the trial, and the defendant cites no law to support this theory. In addition, the defendant raises no facts to suggest that the government acted in violation of the Fourth, Fifth and Sixth amendments. A response to this motion is impossible and the government moves that the motion be denied.

At the hearing the Court had counsel for Defendant clarify their arguments. The Court understands Defendant's arguments to be as follows:

1. Defendant's statements to law enforcement officers on January 6, 2006, were illegally-obtained, without Miranda warnings;

2. Any evidence or statements obtained after the January 6, 2006, statement must be suppressed as "fruits of the poisonous tree;"

3. Certain documentary evidence must be suppressed because it includes references to "motorcycle gangs" in general, and the Outlaws and Pagans in particular, which references are prejudicial to Defendant; and

4. All the government's evidence must be suppressed because Defendant became a target in early to mid 2005; Defendant was a known user of illegal drugs; and the government made certain individuals with possible criminal charges pending "offers they couldn't refuse" and sent them out on a "fishing expedition" to entrap Defendant. This conduct was so outrageous all evidence should be suppressed.

### A. January 6, 2006 statements

Defendant first argues his statements made January 6, 2006, must be suppressed because he was not Mirandized prior to or during the interview. It is undisputed that Defendant was not Mirandized on or before the January 6, 2006, interview. Miranda warnings are required when a person is subjected to a custodial interrogation. Miranda v. Arizona, 384 U.S. 436 (1966) and Dickerson v. United States, 530 U.S. 428, 444 (2000). The prevailing test for whether a person is "in custody" during interrogation triggering Miranda warnings is whether, when viewed from a totality of the circumstances, the "suspect's freedom of action is curtailed to a degree associated with

formal arrest." Berkemer v. McCarty, 468 U.S. 420, 440 (1984); United States v. Photogrammetric Data Services, 259 F.3d 229, 240-242 (4th Cir. 2001), cert. denied, 535 U.S. 926 (2002); and United States v. Howard, 115 F.3d 1151, 1154 (4th Cir. 1997). In United States v. Martindale, 790 F.2d 1129 (4th Cir. 1986), the Fourth Circuit held that Miranda is applicable only in cases where the defendant is in custody. As to the defendant in Martindale, the Court affirmed the District Judge's denial of the suppression motion, noting:

> In both interviews the defendant freely consented to answer the agent's questions. He was thus under no restraint; he was subjected to no coercive action, either in word or deed. He was at liberty to terminate the discussion and to go his way anytime he chose to leave. He was neither under arrest nor in any type of custodial situation in either case. In fact, the Pederson interview was in the defendant's own office.

The undisputed evidence here is that the officers went to Defendant's own home, knocked on the door, identified themselves, and were let in by Defendant. They told Defendant why they were there and told him they were not going to arrest him that day. Defendant was not handcuffed or restrained in any manner. He was told prior to the interview that he did not have to talk to the officers at all. When he became reluctant to talk about certain things, the officers told him he did not have to talk about those things, and changed the subject.

The evidence shows Defendant was not subjected to a custodial interrogation on January 6, 2006. It was therefore not necessary for the officers to Mirandize him before he voluntarily spoke with them. The undersigned therefore finds the statements made by Defendant to law enforcement officers on that date were not illegally obtained and are therefore admissible.

The undersigned therefore respectfully **RECOMMENDS** Defendant's motion to suppress his January 6, 2006, statements to police be **DENIED**.

### B. Statements and evidence obtained subsequent to the January 6, 2006, interview.

Defendant next argues that any evidence or statements obtained after the January 6, 2006, statement must be suppressed as "fruits of the poisonous tree." Because the undersigned finds the January 6, 2006, statements are admissible, it follows that evidence obtained subsequent to that interview are not "fruits of the poisonous tree." In fact, there can be no dispute that Defendant voluntarily called Agent Fox back on or about January 12, 2006, on a cell phone. There is also no dispute that Defendant was Mirandized on January 13, 2006.

The undersigned finds the statements made to police and evidence obtained on and after January 6, 2006, are admissible, and therefore respectfully **RECOMMENDS** Defendant's motion to suppress those statements and evidence on those grounds be **DENIED**.

### C. Documentary evidence

Defendant also argues that certain documentary evidence must be suppressed because it includes references to "motorcycle gangs" in general, and "Outlaws" and "the Pagans" in particular, which references would be prejudicial to Defendant if seen by the jury. There is no allegation that this evidence was unlawfully obtained or otherwise tainted. Further, no evidence or examples were presented to the undersigned regarding this argument. The undersigned therefore respectfully **RECOMMENDS** Defendant's motion to suppress this evidence be **DENIED**. In doing so, the undersigned makes no determination as to whether the evidence may be deemed inadmissible in whole or in part pursuant to a Motion in Limine.

### D. "Fair Play" argument

Defendant also argues that the government's conduct in this case was so outrageous all evidence should be suppressed. As grounds for this argument, Defendant claims he became a target

in early to mid-2005; he was a known user of illegal drugs; and the government made certain individuals with possible pending criminal charges "offers they couldn't refuse," sending them out on a "fishing expedition" to entrap him. Defendant alleges the Government's primary informant was Ross Sine, that Mr. Sine "has committed homicides," and the use of that informant was therefore "not fair play" and amounted to entrapment, and also tainted the grand jury. Defendant further argues the burden is on the Government to show the grand jury was not tainted by the Government's having made non-documented deals and controlled buys that involved people who may have committed serious criminal acts known to the police. Defendant cites no case in support of this argument, but asserts he did not want to waive any constitutional issues.

The Government argues that responding to this motion would require a trial before a trial, and would require it to prove its case on a motion to suppress. The Government also argues that Defendant's claim that "it's unconstitutional" is not enough to suppress the evidence. The undersigned agrees. Defendant has not stated any particular grounds for suppressing any of the evidence. While Defendant argues the Government's use of deals and controlled buys utilizing known criminals is "outrageous," he offers no support for that claim. While not precedential, the undersigned finds a discussion in a case from the Southern District of West Virginia instructive. In United States v. Dyess, 293 F.Supp. 2d 675 (S.D.W.V. 2003), United States District Judge Haden stated:

> Government conduct may violate due process and prevent prosecution of a defendant who is predisposed to commit the crime, if the conduct is truly egregious. *Hampton v. United States*, 425 U.S. 484, 492-93, 96 S.Ct. 1646, 48 L.Ed. 113 (1976)(Powell, J., concurring); *United States v. Jones*, 18 F.3d 1145, 1154 (4th Cir. 1994). In *Rochin v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), the Supreme Court vacated the conviction of a suspected drug dealer whose stomach had been forcibly pumped to obtain capsules as potentially incriminating evidence he had been seen to

9

swallow. Twenty years later, the Court noted that *Rochin* was rare but not unique. In dictum, the Court noted it might "some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *United States v. Russell*, 411 U.S. 423, 431-32, 93 S.Ct. 1637, 36 L.Ed. 2d 366 (1972) (citing *Rochin*). Such outrageous government misconduct, however, must violate that "'fundamental fairness, shocking to the universal sense of justice' mandated buy the Due Process Clause of the Fifth Amendment." *Id.* at 432, 93 S.Ct. 1637. In *United States v. Payner*, 447 U.S. 727, 100 S.Ct. 2439, 65 L.Ed. 2d 468 (1980), the Court potentially narrowed the doctrine further when it explained that even if an unlawful search was "so outrageous as to offend fundamental 'canons of decency and fairness,' . . . the fact remains that '[t]he limitations of the Due Process Clause . . . come into play only when the government activity in question violates some protected right of the defendant.'" *Id.* at 737 n. 9, 100 S.Ct. 2439 (quoting *Hampton*, 425 U.S. at 490, 96 S.Ct. 1646)(plurality opinion)(internal citations omitted).[2]

The Fourth Circuit accepts the continued viability of the outrageous government conduct doctrine, but makes clear that a due process violation occurs only where official conduct is not simply offensive, but is truly outrageous. *United States v. Goodwin*, 854 F.2d 33, 37 (4th cir. 1988). As the Appeals Court noted, the appellate courts have "over time continued to demonstrate a high shock threshold in the presence of extremely unsavory government conduct." *United States v. Osborne*, 935 F.2d 32, 36 (4th Cir. 1991); *see also Indictments*, 91 Geo. L.J. 236, 239 n. 843 (2003)(collecting cases acknowledging the outrageous government misconduct doctrine, none of which find such misconduct). The First Circuit has declared the outrageous government misconduct doctrine "moribund" in light of the fact that, in practice, "courts have rejected its application with almost monotonous regularity." *United States v. Santana*, 6 F.3d 1, 4 (1st Cir. 1993)("The banner of outrageous conduct is often raised but seldom saluted."). To reach this high standard of outrageousness is no easy matter:

> Although the requirement of outrageousness has been stated in several different ways by various courts, the threshold of each of these formulations is that the challenged conduct must be shocking, outrageous, and clearly intolerable. . . . The cases make it clear that this is an extraordinary defense reserved for only the most egregious

---

[2]FN.13 While conflated in their origins, the doctrines of entrapment and outrageous government conduct are different and distinguishable. The due process argument is distinct from the traditional entrapment defense because it does not focus on the predisposition of the defendant. United States v. Russell, 411 U.S. 423, 434, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973). Rather this doctrine focuses on the means employed in a police investigation.

> circumstances. It is not to be invoked each time the government acts deceptively or participates in a crime that it is investigating. Nor is it intended merely as a device to circumvent the predisposition test in the entrapment defense. *United States v. Mosley*, 965 F.2d 906, 910 (10th Cir. 1992)(collection and reviewing cases).

The motion before the undersigned is a motion to suppress evidence, not a motion to dismiss the indictment, but the grounds are the same.[3] In fact, a suppression of all the government's evidence based on outrageous conduct would almost certainly result in dismissal of the entire case. There is no reason to believe that the standard for a finding of outrageous conduct would be any different because the issue was raised in a motion to suppress evidence.

Based on the motions, evidence, and argument before me at the time of the hearing, the undersigned finds Defendant has not shown the Government's conduct in investigating and prosecuting his case was in any way "outrageous."

The undersigned therefore respectfully **RECOMMENDS** Defendant's motion to suppress on those grounds be **DENIED**.

### III. RECOMMENDATION

For all the above reasons, the undersigned respectfully **RECOMMENDS** Defendant's Motion to Suppress [Docket Entry 35] be **DENIED**.

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, Chief United States

---

[3]Defendant has filed a Motion to Quash or Dismiss the Indictment, but that motion has not been referred to the undersigned.

District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such report and recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The clerk is directed to send copies of the within Report and Recommendation to all counsel of record.

Respectfully submitted: March 30 2006.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE